**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Criminal No. 23-cr-00394-002 (TNM)** |
| | : | |
| **RONNIE ROGERS,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENENCING**

The United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing. As set forth below, the government respectfully requests that the Court sentence the Defendant, Ronnie Rogers, to a sentence of 248 months of imprisonment and 5 years of supervised release. In support of this sentence, the government states the following.

**PROCEDURAL BACKGROUND**

The Defendant has pled guilty to a three-count Superseding Information charging him with the following offenses: Conspiracy to Distribute and Possess with Intent to Distribute 400 Grams or More of a Mixture or Substance Containing a Detectable Amount of Fentanyl, 100 Grams or More of a Mixture and Substance Containing a Detectable Amount of any Analogue of Fentanyl, and 100 Grams or More of a Mixture and Substance Containing a Detectable Amount of Heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi), 841(b)(1)(B)(i) and 846 (Count One); Conspiracy to Distribute and Possess with Intent to Distribute 500 Grams or More of a Mixture or Substance Containing a Detectable Amount of Cocaine, and a Mixture and Substance Containing a Detectable Amount of Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi) and 841(b)(1)(C), and 846 (Count Two); and Using, Carrying, and Possessing a Firearm During a

1

Drug Trafficking Offense, in violation of 18 U.S.C. § 9824(c)(1)(A)(i) (Count Three). See Presentence Investigation Report ("PSR") dated February 27, 2026, at ¶¶ 4-7.

Violations of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), carry a mandatory minimum sentence of 10 years of imprisonment and a maximum sentence of life imprisonment, a fine not to exceed $10,000,000, and a term of supervised release of not less than five years and up to life. Violations of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B), carry a mandatory minimum sentence of 5 years of imprisonment and a maximum sentence of 40 years of imprisonment, a fine not to exceed $5,000,000, and a term of supervised release of not less than four years and up to life. Violations of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C), carry a maximum sentence of 20 years of imprisonment, a fine not to exceed $1,000,000, and a term of supervised release of not less than three years and up to life. A violation of 18 U.S.C. § 924(c)(1)(A)(i) carries a mandatory minimum sentence of 5 years of imprisonment and a maximum sentence of life imprisonment to be served consecutive to any other term of imprisonment, a maximum fine of $250,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3571(b)(3), and a term of supervised release of not more than five years, pursuant to 18 U.S.C. § 3583(b)(1). PSR at ¶¶ 7-9.

The plea documents reflect that the Defendant's total offense level, after acceptance of responsibility, is 33 for Counts One and Two and his criminal history category is II, resulting in an estimated sentencing guidelines range for Counts One and Two of 151 months to 188 months. However, because the Defendant also pled guilty to an offense in violation of 18 U.S.C. § 924(c)(1) (Count Three), the guideline sentence for that offense is the minimum term of imprisonment required by statute, that is, not less than 5 years' incarceration (60 months) to run consecutively to

any other term of incarceration. U.S.S.G. § 2K2.4(b).  Accordingly, the plea documents estimated that the Sentencing Guidelines range, in aggregate, is 211 months to 248 months incarceration. PSR at ¶ ¶ 11-14.

The PSR, after a careful review of Defendant's criminal history, correctly reflects that the defendant is a career offender with a resulting Sentencing Guidelines range of 322 months to 387 months incarceration.[1]  PSR at ¶ ¶ 62-68.

## **FACTUAL BACKGROUND**

The Drug Enforcement Administration commenced an investigation into a drug-trafficking organization that imports into, and distributes within, the United States fentanyl, heroin, PCP, cocaine, cocaine base, and other controlled substances.  Through the investigation, including recoveries of many kilograms of fentanyl, fentanyl analog, heroin, and other illegal drugs, and wiretap interceptions over the course of the investigation, law enforcement was able to identify Defendant Ronnie Rogers, Wayne Glymph, and Samuel Braxton, as being the key players in this drug trafficking operation.  Defendant coordinated with his co-conspirators to import and traffic fentanyl, fentanyl analog, heroin, cocaine and cocaine base in the District of Columbia and elsewhere.  Defendant's participation in the operation included over 12 kilograms of fentanyl (including carfentanil), almost 2 kilograms of fentanyl analog (p-Fluorofentanyl), over 236 grams

---

[1] The Defendant has objected to the conclusion in the PSR that he is a career offender.  He argues that his plea of guilty to the conspiracy counts under 21 U.S.C. § 846 (Counts One and Two), and his guilty plea for possessing a firearm during a drug trafficking offense under 18 U.S.C. § 924(c) in Count Three, do not require proof of any overt acts in the underlying conspiracies and are, thus, inchoate.  Accordingly, the defense argues that his conspiracy offenses do not meet the definition of "controlled substance offenses" because the definition requires the actual acts of manufacturing, importing, exporting, distributing, dispensing of a controlled substance or possessing of a controlled substance with intent to do those acts.  The defense relies upon cases from 2018 and 2019.  However, the defense fails to recognize that the Sentencing Guidelines were amended on November 1, 2023, to specifically provide that a "controlled substance offense" includes inchoate offenses like conspiring to commit, aiding and abetting and attempting to commit any such offense. U.S.S.G. § 4B1.2(b)(1) and (d).  See U.S.S.G. Manuel Appendix C (Vol. IV), Amendment 822 (2025); See also PSR at page 47.

of heroin, over 500 grams of cocaine, and less than 28 grams of cocaine base. From no later than July 2021 and continuing until about November 2023 when the Defendant was arrested, the Defendant conspired to, and did in fact, distribute and possess with intent to distribute fentanyl, fentanyl analogue, heroin, cocaine and cocaine base. In aggregate, the converted drug weight, including from the reasonably foreseeable conduct of all the members of the conspiracy known to the Defendant, was no less than 30,000 kilograms but no greater than 90,000 kilograms.

As the Court knows from the plea hearings in this case, Defendant Rogers and Braxton have known each other for many years. They were incarcerated together at FCI Butner in North Carolina for approximately four years between 2015 to 2019. Braxton served part of a 24-year sentence imposed in a District of Maryland case at FCI Butner, and Rogers was serving a sentence of over 10 years for a separate federal heroin trafficking conviction from the District of Maryland. Rogers was released from prison in July 2019 and returned to the DC area. Glymph's involvement with Braxton was also not a recent manifestation. Glymph and Braxton have known each other and have been partners in crime for many years. On or about February 22, 2012, Braxton and Glymph were indicted together in the District of Maryland criminal case (Crim. No. 8:12-cr-86) for conspiring to distribute and possess with the intent to distribute heroin, cocaine base, and PCP. Both were convicted of the conspiracy and incarcerated. Braxton was eventually incarcerated at FCI Butner in North Carolina and at FCI Fort Dix in New Jersey. Braxton was housed at FCI Fort Dix during the entirety of this investigation. He continues to serve the District of Maryland sentence.

Glymph completed his District of Maryland sentence in December 2020 and then returned to the DC area. In 2021, while Braxton was incarcerated at Fort Dix with access to a contraband

4

cell phone, he introduced Glymph to foreign nationals who were sources of supply of fentanyl, fentanyl analogue, heroin, and other drugs. Braxton also introduced Glymph to his former jail mate, Ronnie Rogers, for the purpose of Rogers and Glymph acquiring shipments of drugs from the foreign nationals and then cutting, repackaging and redistributing the drugs in and around the District of Columbia. Glymph and Rogers were responsible for paying for the shipments.

In 2021, 2022, and 2023, Rogers, Glymph, and Braxton communicated with foreign nationals and coordinated the shipments of kilogram quantities of fentanyl, fentanyl analogue, heroin, and other drugs to the DC area for redistribution purposes, including the following:

a. A parcel containing 999 grams of fentanyl (with a purity of approximately 40%) seized by law enforcement on August 4, 2022, that was destined for a residence of Ronnie Rogers;

b. A parcel containing 982 grams of fentanyl (with a purity of approximately 65%) seized by law enforcement on October 26, 2022, which was destined for a residence utilized by Rogers and Glymph;

c. A parcel containing 996 grams of fentanyl (with a purity of approximately 40%) seized by law enforcement on October 31, 2022, which was destined for a residence of Ronnie Rogers;

d. A parcel of approximately one kilogram of fentanyl that was delivered to a residence utilized by Rogers and Glymph on December 19, 2022;

e. Approximately 300 grams of fentanyl (purity of approximately 68%) seized by law enforcement in April 2023;

f. A parcel containing 551.4 grams (5215 counterfeit pills) of fentanyl/acetaminophen

(with a purity of approximately 2.1%) seized by law enforcement on April 26, 2023, which was destined for a residence utilized Rogers and Glymph;

g.  A parcel containing 236.2 grams of heroin seized by law enforcement on July 6, 2023, which was destined for a residence utilized by Rogers and Glymph;

h.  A parcel containing 97.4 grams of fentanyl (899 counterfeit pills with a purity of approximately 4%) and 777 grams of fentanyl (powder with a purity of approximately 62%) seized by law enforcement on July 20, 2023, which was destined for a residence utilized by Rogers and Glymph;

i.  Approximately 2000 grams of fentanyl delivered to Ronnie Rogers at a residence of Ronnie Rogers in approximately August 2023;

j.  A parcel containing approximately 300 grams of fentanyl delivered to a residence of Ronnie Rogers on September 30, 2023;

k.  A parcel containing 1967.7 grams of p-Fluorofentanyl (fentanyl analogue, a Schedule I narcotic) delivered to a residence utilized by Rogers and Glymph on October 2, 2023;

l.  A parcel containing 1006.8 grams of carfentanil and fentanyl delivered to a residence of Ronnie Rogers on October 17, 2023; and

m.  A parcel containing 1013 grams of fentanyl (purity of approximately 37%) delivered to and seized in November 2023 from the residence of Glymph's girlfriend that was a residence utilized by the Glymph and Ronnie Rogers.

Rogers, Glymph and Braxton coordinated the ordering, shipment, and receipt of, and payment for, the drugs with other members of the conspiracy, including their suppliers. This included coordinating where the drugs would be shipped to, the sharing of shipper tracking

information for the drugs, and the sharing of shipper tracking information for the shipment of drug payments.

The following illustrates how Rogers, Glymph and Braxton coordinated a shipment of fentanyl:

On October 22, 2022, Rogers received a call from Glymph. In activation #638, Glymph asked Rogers, "*You talk to Fatso* (Braxton's known nickname)?" Rogers replied, "*Uh, yesterday, last night.*" Rogers asked Glymph, "*Are you getting him all the information they need*? Glymph replied, "*Yeah.*" Rogers then asked, "*Well, they send you a tracking yet?*" After Glymph replied, "*Nope,*" Rogers stated, "*Ok, well then….when we get a tracking, I can know when to go round there and sit there, you know what I'm saying.*" Later that day, Rogers made a call to Glymph, in activation #677, and Glymph said, "*We going out uhh at the latest Tuesday, at the earliest Monday morning we be in the mail.*" Rogers replied, "*Oh, ok. As soon as you get it let me know something….*" In these calls, Rogers asked Glymph if he was getting Braxton what he needed for the drug shipment. After Glymph said he did, Rogers asked if he got the tracking information from Braxton for the drug shipment. Glymph said he had not yet received the shipping tracking information. In the subsequent call, Glymph advised Rogers that the drug shipment would be in the mail Monday or Tuesday.

On Tuesday, October 25, 2022, Glymph called Rogers in activation #1059 and stated, "*Aight, he said he'll send the receipt, it's, it's out.*" Glymph continued, "*He said, it's out, it's already gone.*" Later that day, in activation #1065, Glymph sent a picture message to Rogers of a picture of a shipping label that was addressed to a "Gregory

Stephenson" at "**** [the number is being intentionally omitted by the undersigned] Foster, District Heights, MD 20747." The parcel was being shipped via UPS and was bearing the tracking number 1Z5XW8740153708431.

As a result of these intercepted communications between Glymph, Braxton, and Rogers, law enforcement went to the UPS facility in Landover, Maryland, on October 26, 2022, and recovered the parcel addressed to a "Gregory Stephenson" at **** Foster, District Heights, Maryland 20747-2240, bearing the tracking number 1Z5XW8740153708431. After obtaining a search warrant for the package, law enforcement seized 982 grams of fentanyl with a purity of approximately 65 percent. The parcel was shipped from California.

Communications evidence, as well as physical seizures and recoveries of many kilograms of fentanyl and heroin over the course of the investigation, indicate that the Defendant coordinated with foreign nationals and his DC area-based co-conspirators to traffic in fentanyl and heroin.

During the conspiracy and as evidenced by wiretap interceptions, seizures and other evidence, the Defendant also acquired wholesale quantities of cocaine and cocaine base, including from co-conspirators Kevin Quattlebaum and Michael Stewart. The Defendant also redistributed wholesale quantities of illegal drugs, including fentanyl, heroin, cocaine, and cocaine base, to his coconspirators, including Michael Stewart, OJ Brown, Ricky Jackson and Michael Owens, who then redistributed the drugs. The Defendant was instrumental in acquiring, cutting, packaging and redistributing the many kilograms of fentanyl, heroin, cocaine and crack cocaine that was being acquired through the conspiracy.

On November 29, 2023, law enforcement officers executed search warrants on two residences of the Defendant and one residence utilized by the Defendant and Wayne Glymph. The

two residences of the Defendant are located at Massachusetts Avenue, N.W., Washington, D.C., and Gateway Boulevard, District Heights, Maryland.  The residence utilized by the Defendant and Wayne Glymph is located at Pineview Court, Waldorf, Charles County, Maryland.

As a result of the search warrant executed on the Massachusetts Avenue residence, law enforcement recovered drug, drug trafficking paraphernalia, and firearms evidence, including the following:

a. A large red tote bag (Ex. 48)[2] with powdered residue found on the floor in the defendant's bedroom closet containing:

- A large Ziploc bag containing 494.8 grams of heroin (purity $16\% \pm 2\%$), fentanyl (purity $13\% \pm 1\%$), and carfentanil (Ex. 40).
- A large Ziploc bag with 704.8 grams of carfentanil (Ex. 41).
- A white envelope with 115.91 grams of fentanyl (Ex. 37).
- Ziplock bag containing 201.22 grams of fentanyl (3.8% pure) (Ex. 43).
- A laptop bag (Ex. 35a) containing fentanyl and heroin residue.
- Ziplock bags containing 1,785.30 grams of acetaminophen (Ex. 35.01) and 18.13 grams of fentanyl (Ex. 35.02).
- Scissors with fentanyl residue (Ex. 35b).
- A brown bag containing fentanyl, cocaine, and heroin residue (Ex. 36).
- Multiple cards with fentanyl and heroin residue (Ex. 36a).
- Razor blades with fentanyl and cocaine residue (Ex. 36b).
- Multiple empty Ziplock bags (Ex. N-77).
- 3 bottles of Manitol (a cutting agent) (Ex. N-78).
- Multiple containers of rubber bands (Ex. N-79).
- Fentanyl test strips (Ex. N-80).
- Multiple smaller Ziplock bags (Ex. N-81).
- 3 spoons with fentanyl and heroin residue (Ex. 38).
- 5 Scales with residue (Exs. 39, 44, 45, 47).
- Multiple Ziploc bags with Caffeine and Diphenhydramine (Ex. 42.01).
- Multiple strainers and spoons with residue (Ex. 46).
- A pink bag with fentanyl, cocaine, heroin residue (Ex. 49).

b. Firearms, ammunition and firearms related evidence recovered from the bedroom

---

[2] Exhibit numbers refer to the DEA exhibit designations contained in the DEA reports.

dresser, including the following:

- Multiple rounds of 9mm and 45mm ammunition (Ex. N-89).
- 3 black holsters (Ex. N-90).
- 1 Springfield Armory magazine (Ex. N-91).
- 2 boxes of 9mm ammunition and 1 box of 45mm ammunition (Ex. N-92).
- 1 Smith & Wesson SD-40 firearm (serial number FDU3979) and magazine contained therein (Exs. N-72 and N-72a).
- 1 Glock 43 firearm (serial number ADXE162) and magazine contained therein (Exs. 73 and N-73a).
- 1 Rugar LCP firearm (serial number 371870223) and magazine contained therein (Exs. N-74 and N-74a).

c. Approximately $23,000 in United States Currency recovered from the bedroom dresser and a shoebox in the bedroom closet (Ex. N-53).
d. One face mask with white powder residue that tested positive for fentanyl found on the high-top kitchen table (Ex. 50).
e. Two boxes of disposable masks found on kitchen table in living room (Ex. N-82).
f. One black FoodSaver Sealing Machine found in far-right kitchen cabinet (Ex. N-83).
g. One white camera with charging cable (Ex. N-84).
h. One notebook apparently with drug mixture instructions (N-85) found on kitchen table in living room.
i. One container of rubber bands found on kitchen table in living room (Ex. N-86).
j. One box of Ziploc baggies found on kitchen table in living room (Ex. N-87).
k. One box of Nitrile Exam gloves found on kitchen table in living room (Ex. N-88).

As a result of the search warrant executed on defendant's Gateway Boulevard residence, law enforcement recovered United States Currency, drug, drug trafficking paraphernalia, and firearms evidence, including the following.

a. Drug and drug trafficking paraphernalia included the following:

- 2 Ziploc bags containing 151.2 grams of fentanyl (purity 3.7% ± .5%), (Ex. 22).
- Several Ziploc bags containing .963 grams of fentanyl (8.4% pure) (Ex. 24).
- 2 plastic bags containing 2.451 grams of xylazine (Ex. 25.01) and 1.756 grams of heroin, fentanyl (Ex. 25.02).
- 2 plastic bags containing bundles of Ziplock bags containing 7.730 grams of fentanyl, heroin, xylazine (Ex. 26.01), 1.441 grams of carfentanil (Ex. 26.02), and 2.813 grams of acetaminophen (Ex. 26.03).

- 1 black bag containing residue and drug trafficking paraphernalia (Ex. 27), and 2 bundles of 20 Ziplock baggies containing 5.08 grams of fentanyl (purity 8.8%), heroin and xylazine (Ex. 52).
- Bags containing 97.35 grams of heroin and fentanyl (purity 15%) (Ex. 51.01), 5.442 grams of cocaine base (purity 85%) (Ex. 51.02), 14.23 grams of fentanyl and xylazine (purity 3.5%) (Ex. 51.03).

b. Firearms, ammunition and firearms related evidence recovered included the following:

- 1 Smith and Wesson Revolver (serial number 4K24356) containing 6 rounds .357 magnum ammunition (Exs. N-61 and N-61a).
- 1 Smith and Wesson 40 magazine containing 10 rounds .40 cal. ammunition (N-94 and N-94a).
- 1 Springfield XD firearm (serial number XD981327) containing 9mm ammunition (Exs N-62 and N-62a).
- 1 Canik TP9 pistol (serial number T6472-19 AT03768) (Ex. N-63).
- 2 extended pistol magazines containing 14 rounds of 9mm ammunition (Exs. N-95 and N-95a.
- 1 box containing 23 rounds of .40 caliber ammunition (Ex. N-96).

c. Approximately $1,524.00 in United States Currency (Ex. N-52).

As a result of the search warrant executed on the Pineview Court residence, law enforcement recovered a FedEx parcel containing 1013.1 grams of fentanyl (purity 37% ± 3%) (Exs. 61 and 62).

The Defendant has admitted that the above-described drug evidence, drug trafficking paraphernalia, U.S. Currency, firearms, ammunition, and firearms paraphernalia belonged to him, were acquired by him, possessed by him and/or were redistributed by him as part of and in furtherance of the conspiracy to distribute and possess with the intent to distribute illegal drugs.

The Defendant also admits that the above-described firearms and ammunition belonged to him and that he possessed the firearms in furtherance of the drug trafficking conspiracy, including to protect his drugs, drug proceeds, and himself.

Defendant is accountable for the following quantities of narcotics: more than 12 kilograms but less than 36 kilograms of fentanyl; more than 1 kilogram but less than 3 kilograms of any analogue of fentanyl; more than 100 grams but less than 400 grams of heroin; more than 500 grams of cocaine; and more than 2.8 grams of cocaine base.  These amounts result in an aggregate total converted drug weight under the United States Sentencing Guidelines of approximately 50,102 kilograms. PSR ¶ 56.  This quantity represents the total amount involved in Defendant's relevant criminal conduct, including amounts he distributed or possessed with intent to distribute, and amounts distributed or possessed with intent to distribute by his co-conspirators pursuant to jointly undertaken criminal activity that was reasonably foreseeable by the Defendant and within the scope of his conspiratorial agreement.

## SENTENCING FACTORS

In sentencing a defendant, after calculating the appropriate guideline range, the Court must consider the factors set forth in 18 U.S.C. Section 3553. See Gall v. United States, 552 U.S. 38 (2007). These factors are in keeping with the traditional factors used by courts when imposing a sentence: (1) the protection of society against wrongdoers; (2) the punishment or discipline of the wrongdoer; (3) deterrence from the commission of like offenses; and (4) the reformation of the wrongdoer. See Spanziano v. Florida, 468 U.S. 447, 477-78 (1984) (Stevens, J., concurring); see also Williams v. New York, 337 U.S. 241, 251 (1949). Finally, under the guidelines and Section 3553, similarly situated defendants should receive like punishments. See 18 U.S.C. Section 3553(a)(6).

First, this is a very serious offense.  The Defendant, along with Braxton and Glymph, were at the top tier of a large drug trafficking conspiracy involving at least eight individuals, as reflected

12

in the indictment in this case.  He became the most important member of the conspiracy when it came to taking physical control of the drugs being imported and preparing the drugs for redistribution.  He took delivery of the drugs, and then stored, cut, and repackaged the drugs.  He also shipped payments to the drug suppliers.  The Defendant has agreed that he is accountable for acquiring, possessing with the intent to distribute, and redistributing massive quantities of extremely potent fentanyl, fentanyl analogue, heroin, cocaine and cocaine base.  His importation, and redistribution of fentanyl, fentanyl analogue, and heroin, the most dangerous and addictive drugs in our community and nation, establishes that the Defendant was indifferent to the destruction he and his co-conspirators were causing to the users of their illegal narcotics and to the community at large.  These drugs are significant barriers to individual and communal prosperity, public health, and community safety.  They contribute to the decay of our society and community and accounts for tens of thousands of overdose deaths in this country each year.  The will of the Defendant to continually make himself an available gateway for these drugs on behalf of international traffickers shows his clear disregard for our community and his paramount desire to make personal profit.  It was the Defendant's role in the conspiracy to bring these dangerous drugs to the United States market for redistribution, all for a profit. The detrimental effect of all these drugs is further compounded by their high purity, which would allow for the cutting and redistribution of far larger quantities of narcotics.

Second, Defendant's criminal behavior in this case is amplified by an abysmal criminal history, stretching 50 years.  It includes several drug trafficking convictions, including at least three prior federal drug trafficking convictions from the District of Columbia, the Eastern District of Virginia and the District Maryland.  He also has convictions for crimes of violence and prior

13

gun possession.  PSR at ¶¶ 70-76.  His record on supervised release is similarly appalling, with numerous violations.  Id.  It is not surprising that he is a career offender.

Three previous 10 plus year terms of imprisonment for drug trafficking also proved insufficient to deter Rogers from importing and redistributing controlled substances in this case. Upon release from his most recent stint, Rogers not only maintained but increased his criminal network.  As discussed above, Rogers and Braxton were housed together while both were serving long federal sentencings for drug trafficking conspiracy.  After being released from prison and still on supervised release, Braxton introduced Rogers to Glymph and to foreign suppliers for the purpose of importing into this country and trafficking the deadliest of drugs.  Rogers turned those introductions into a large-scale drug trafficking enterprise that had many redistributors. As the Court knows, Rogers also had redistributors stationed near drug treatment facilities to take advantage of opioid addicts.

Third, Defendant's long criminal history, along with his involvement in an extensive drug trafficking conspiracy, evidence his unwavering desire to pursue a life of crime and profit at the expense of his community.  The law makes clear that his crimes in the instant case are of a kind that require serious consequences to deter the recurrence of such conduct by him and others.  A strong, though appropriate, sentence is necessary to ensure the safety of the community and, hopefully, to deter Defendant from engaging in similar criminal conduct in the future.  It is now time to protect our community, and a stiff penalty would be appropriate.  Accordingly, the recommended sentence of 248 months of imprisonment and 5 years of supervised release will provide needed deterrence in order to protect the community from Defendant's criminal behavior. We note that the government's recommendation is within the guidelines range estimated in the

14

plea documents and not within the higher career offender guidelines reflected in the PSR.

WHEREFORE, for the foregoing reasons and for any other reasons that may be raised at the hearing on this matter, the government asks that the Court sentence the Defendant to the term of incarceration of 248 months of imprisonment and 5 years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: _/s/_ *George Eliopoulos*_____
GEORGE ELIOPOULOS
Assistant United States Attorney
D.C. Bar No. 390-601
MATTHEW KINSKEY
Assistant United States Attorney
601 D Street, N.W.,
5th Floor
Washington, D.C. 20530
202-252-6957
george.p.eliopoulos@usdoj.gov

15